[Civ. No. 24370. Third Dist. Feb. 11, 1986.]

GEORGE NICHOLSON, Plaintiff and Appellant, v.
McCLATCHY NEWSPAPERS et al., Defendants and Respondents.

510

COUNSEL

Greve, Clifford, Diepenbrock & Paras and Thomas S. Knox for Plaintiff and Appellant.

Diepenbrock, Wulff, Plant & Hannegan, Charity Kenyon, Munger, Tolles & Rickershauser, Allen M. Katz, Anne H. Egerton and Diane M. Johnson for Defendants and Respondents.

OPINION

**SPARKS, J.**—Plaintiff George Nicholson brought suit against the State Bar of California and two newspapers and their reporters for damages and other relief. The action arose out of the publication of the unauthorized disclosure of the confidential fact that the Commission on Judicial Nominees Evaluation had found plaintiff was not qualified for judicial appointment. Defendants McClatchy Newspapers, Claire Cooper, Daily Journal Company, and Larry Sokoloff (media defendants) demurred to the complaint on the grounds that the publication was privileged under the First Amendment.

Although plaintiff's complaint set forth ten causes of action against the media defendants, the primary thrust of the complaint was that the media defendants violated his right to privacy by obtaining and publishing information which by law was confidential. The trial court found that publication of the information was constitutionally privileged and consequently sustained the demurrers of the media defendants without leave to amend. On appeal plaintiff attempts to distinguish between publication of confidential information lawfully obtained by the press and that obtained tortiously. He argues that the publication of legally confidential information obtained by tortious conduct is not protected by the First Amendment. ■ We agree that illegal conduct by a reporter is not privileged simply because the ulti-

mate purpose is to obtain information to publish. But the First Amendment protects the ordinary news-gathering techniques of reporters and those techniques cannot be stripped of their constitutional shield by calling them tortious. Since the complaint did not allege any impermissible reporting techniques, the demurrers were properly sustained.

## FACTUAL AND PROCEDURAL HISTORY

Before the Governor can appoint a person to a judicial office he is statutorily required to submit the names of all potential appointees or nominees to a designated agency of the State Bar of California for an evaluation of their judicial qualifications. (Gov. Code, § 12011.5, subd. (a).) The State Bar is required to employ appropriate confidential procedures to evaluate and determine the qualifications of each candidate with regard to his or her ability to discharge the judicial duties of the office to which the appointment or nomination shall be made. (Gov. Code, § 12011.5, subd. (c).) "Within 90 days of submission by the Governor of the name of a potential appointee for judicial office, the State Bar shall report in confidence to the Governor its recommendation whether the candidate is exceptionally well-qualified, well-qualified, qualified or not qualified and the reasons therefor, and may report, in confidence, such other information as the State Bar deems pertinent to the qualifications of the candidate." (*Ibid.*)

The evaluation of the State Bar, with two exceptions, is required to be kept confidential. Confidentiality is mandated by section 12011.5, subdivision (f), which provides: "All communications, written, verbal or otherwise, of and to the Governor, the Governor's authorized agents or employees, including, but not limited to, the Governor's Legal Affairs Secretary and Appointments Secretary, or of and to the State Bar in furtherance of the purposes of this section are absolutely privileged from disclosure and confidential, and any communication made in the discretion of the Governor or the State Bar with a candidate or person providing information in furtherance of the purposes of this section shall not constitute a waiver of such privilege or a breach of confidentiality." The first exception is when the Governor has appointed a person found not qualified to a trial court in which case the State Bar may make its evaluation public after due notice to the appointee. The second exception arises when the Governor appoints a person to an appellate court, in which case the evaluation and the reasons therefor may be submitted to the Commission on Judicial Appointments. (Gov. Code, § 12011.5, subds. (g), (h).)

In April 1983, the Governor submitted plaintiff's name to the State Bar and its designated agency known as the Commission on Judicial Nominees Evaluation (Commission). The Commission rated plaintiff unqualified for

judicial office and he was not thereafter appointed to judicial office. Although the fact that the State Bar rated plaintiff unqualified for judicial office was required to be kept absolutely confidential, that fact was in some manner communicated to the media defendants who published it in their newspapers, the Sacramento Bee and the Los Angeles Daily Journal, in July 1983.

Plaintiff filed his complaint against the media defendants and the State Bar in March 1984. He alleged that the defendants "conspired and agreed among themselves to disclose to unauthorized persons and for unauthorized purposes, and to publish and advertise to the public at large, the results of the Commission's evaluation of Plaintiff's qualifications for judicial office." Plaintiff set forth 15 causes of action, only the first 10 of which are against the media defendants.[1] Those causes of action are for: (1) breach of Government Code section 12011.5; (2) breach of Civil Code section 1798 et seq.;[2] (3) breach of the common law right of privacy in the public disclosure of private facts; (4) breach of the common law right of privacy by intrusion; (5) breach of the right of privacy under the California Constitution; (6) breach of the right of privacy under the United States Constitution; (7) intentional infliction of emotional distress; (8) negligent infliction of emotional distress; (9) violation of equal protection under the California Constitution; and (10) violation of the right of equal protection under the federal Constitution. Although the legal theories asserted are different, all of the causes of action against the media defendants are based upon the fact that they obtained and published the fact that the State Bar rated plaintiff unqualified for judicial appointment.

The media defendants demurred to the complaint. The trial court sustained the demurrers, ruling that the publications in question were privileged

---

[1]Since we are reviewing a judgment of dismissal following an order sustaining demurrers, we accept as true all properly pleaded facts of the complaint. (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 922 [216 Cal.Rptr. 345, 702 P.2d 503].) Nevertheless, we are not bound to accept conclusionary, ineffectual, or improperly pleaded allegations. (*Moncur* v. *City of Los Angeles* (1977) 68 Cal.App.3d 118, 121 [137 Cal.Rptr. 239].)

[2]These statutes comprise the Information Practices Act of 1977 which generally imposes limitations on the right of governmental entities to disclose personal information about an individual. Section 1798.53 provides in part: "Any person, other than an employee of the state or of a local government agency acting solely in his or her official capacity, who intentionally discloses information, not otherwise public, which they know or should reasonably know was obtained from personal information maintained by a state agency or from 'records' within a 'system of records' (as these terms are defined in the Federal Privacy Act of 1974 (Pub.L. No. 93-579; 5 U.S.C. § 552a)) maintained by a federal government agency, shall be subject to a civil action, for invasion of privacy, by the individual to whom the information pertains."

under the First Amendment of the United States Constitution.[3] The court held that as to the fourth cause of action, breach of the right of privacy through intrusion, the damages caused were due to publication of the information obtained through intrusion and since the publication itself was privileged no cause of action could be stated. The demurrers were sustained without leave to amend and a judgment of dismissal was entered as to the media defendants. The State Bar was not involved in the demurrers to the complaint, and we are not concerned here with the complaint as it relates to the State Bar.

## DISCUSSION

"The right to keep information private often clashes with the First Amendment right to disseminate information to the public. Sensitive to this conflict and the privacy tort's potential encroachment on the freedoms of speech and the press, decisional law recognizes a broad privilege cloaking the truthful publication of newsworthy matters." (*McCall* v. *Oroville Mercury Co.* (1983) 142 Cal.App.3d 805, 807 [191 Cal.Rptr. 280], citations omitted.) At the time of the publications in this case plaintiff had recently campaigned unsuccessfully for the office of Attorney General of the State of California, and was being considered for appointment to judicial office. He was thus a "public figure," and the State Bar's evaluation of his judicial qualifications must be considered "newsworthy." (See *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 535, esp. fn. 5 [93 Cal.Rptr. 866, 483 P.2d 34].) Plaintiff does not contend otherwise, nor does he allege that the media defendants reported their information falsely or even inaccurately. The truthful reporting of newsworthy matters is prima facie privileged. (*Ibid.* See also *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 811-813

[3]The First Amendment mandates that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." (U.S. Const., 1st Amend.) As Chief Justice Hughes noted for the majority more than 50 years ago in *Near* v. *Minnesota* ex rel. *Olson* (1931) 283 U.S. 697, 707 [75 L.Ed. 1357, 1363, 51 S.Ct. 625], "[i]t is no longer open to doubt that the liberty of the press and of speech is within the liberty safeguarded by the due process clause of the 14th Amendment from invasion by state action." But as the high court later explained in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710], the proposition that Fourteenth Amendment is directed against state and not private action has no application when state law is utilized to restrict First Amendment rights. "We may dispose at the outset of two ground asserted to insulate the judgment of the Alabama courts from constitutional scrutiny. The first is the proposition relied on by the State Supreme Court—that 'The Fourteenth Amendment is directed against State action and not private action.' That proposition has no application to this case. Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." (*Id.,* at p. 265 [11 L.Ed.2d at p. 697], citations omitted.)

[163 Cal.Rptr. 628, 608 P.2d 716].) Thus, the allegation that defendants published a truthful account of a newsworthy event about a public figure merely alleges a constitutionally privileged publication.

But plaintiff goes beyond that allegation. He notes that since he was not appointed to a judicial office the Government Code provides that the State Bar's evaluation and communications with the Governor were to remain "absolutely privileged." (Gov. Code, § 12011.5, subd. (f).) Pursuant to this provision plaintiff had the right to expect the State Bar's negative evaluation would remain confidential and, undoubtedly, someone acted in violation of this law in disclosing the evaluation to the media defendants. ■ But this factor alone, as we shall demonstrate, does not operate to render the media defendants liable for civil sanctions or monetary damages in lawsuits.[4]

■ We begin with *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029]. There the Supreme Court considered whether a cause of action for breach of privacy could be maintained for the publication of the name of a deceased rape victim. The victim's father brought a civil action against the defendant broadcaster based upon a state statute which made it a misdemeanor to publish or broadcast the name of a rape victim and upon the common law action for violation of the right of privacy recognized in his state. The Supreme Court decided the case on the narrow ground that "[o]nce true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it." (420 U.S. at p. 496 [43 L.Ed.2d at p. 350].) The plaintiff had not contended that the name was obtained in an improper fashion or that it was not on an official court document open to public inspection and under those circumstances the First and the Fourteenth Amendments precluded the state from making publication of the name the basis of civil liability. (*Ibid.*)

The *Cox Broadcasting* court expressly left open the question whether liability might constitutionally be imposed for the disclosure of information derived through the press's own investigation rather than from public records. (*Id.,* at p. 497, fn. 27 [43 L.Ed.2d at p. 350].) That question arose in *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399,

---

[4]The fact that information is not previously part of the "public domain" may in some cases be considered in determining whether a cause of action for violation of the right to privacy may be stated. (See *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 36 [81 Cal.Rptr. 360, 459 P.2d 912].) But this factor is not in itself sufficient to give rise to a cause of action where the legitimate public interest in the published information is substantial. (*Ibid.*) "Because of their public responsibilities, government officials and candidates for such office have almost always been considered the paradigm case of 'public figures' who should be subjected to the most thorough scrutiny." (*Ibid.,* fn. omitted.)

99 S.Ct. 2667].) The case involved a state statute which made it a misdemeanor to publish the name of a youth charged as a juvenile offender. Reporters learned of a killing at a local school by monitoring a police radio and went to the crime scene. They obtained the name of the young assailant by simply asking various witnesses, the police and an assistant prosecutor. The newspapers printed the name of the youthful offender and were subsequently indicted by the grand jury. The issue was whether the statute was constitutional. The high court noted that its prior opinions "suggest strongly that if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." (443 U.S. at p. 103 [61 L.Ed.2d at p. 405].) Although prior opinions had involved situations in which the government itself had made press access possible, that factor was not controlling because a free press need not rely upon the sufferance of government to supply it with information. (*Id.*, at pp. 103-104 [61 L.Ed.2d at p. 405].) Thus, the government cannot punish the publication of lawfully obtained information except when necessary to further an interest more substantial than was there involved. (*Ibid.*)

In *Landmark Communications, Inc.* v. *Virginia* (1978) 435 U.S. 829 [56 L.Ed.2d 1, 90 S.Ct. 1535], the Supreme Court considered a case which is closely analogous to the situation before us. There a newspaper divulged information regarding proceedings before a state judicial review commission which was authorized to hear complaints about a judge's disability or misconduct. The proceedings were declared confidential by the state constitution and statutes and the newspaper was found guilty of a misdemeanor for publishing the information. The Supreme Court held that the conviction was constitutionally prohibited. The publication which the state sought to punish, "lies near the core of the First Amendment," and although it could be assumed that the confidentiality of the proceedings served a legitimate state interest that interest was not sufficient to justify the encroachment on First Amendment guarantees which the imposition of criminal sanctions entailed upon nonparticipants in the proceedings. (435 U.S. at pp. 838 and 841 [56 L.Ed.2d at pp. 10-11].)

In light of these First Amendment protections, we agree with the trial court that the publication of the State Bar's evaluation of plaintiff must be considered privileged. Plaintiff was a highly visible public figure who was being considered for appointment to judicial office and the State Bar's evaluation of his qualifications for that office was a matter of substantial public interest. The publication of that evaluation, like the publication in *Landmark Communications,* "lies near the core of the First Amendment," and although the state may have an interest in protecting the confidentiality of the

evaluation the "danger" from breach of confidentiality " 'is precisely one of the types of activity envisioned by the Founders in presenting the First Amendment for ratification.' " (*Id.*, at p. 845 [56 L.Ed.2d at p. 14], quoting from *Wood* v. *Georgia* (1962) 370 U.S. 375, 388 [8 L.Ed.2d 569, 579, 82 S.Ct. 1364].) Accordingly state law cannot impose criminal or civil liability upon a nonparticipant for breach of the confidentiality required by Government Code section 12011.5, subdivision (f).

■ Plaintiff recognizes the controlling authority of *Landmark Communications,* and does not contend that the media defendants may be held liable simply for publishing the State Bar's evaluation. He asserts instead that the privilege to publish newsworthy information does not immunize media defendants from liability for torts committed in gathering the information. So long as the tort does not restrict the traditional news-gathering activities of the press, we agree with the general rule urged by plaintiff. In *Landmark Communications* the Supreme Court made it clear that it was not considering the liability of one who obtains confidential information by unlawful means and thereafter divulges it. (435 U.S. at p. 837 [56 L.Ed.2d at p. 9].) Likewise in *Smith* v. *Daily Mail Publishing Co., supra,* the Court noted that the defendant had obtained the information it published through routine newspaper reporting techniques and the Court held that the state could not punish the publication of such lawfully obtained information. (443 U.S. at pp. 103-104 [61 L.Ed.2d at p. 405].) And in *Cox Broadcasting, supra,* the court noted that the plaintiff had not contended that the information disclosed had been obtained in an improper fashion. (420 U.S. at pp. 496-497 [43 L.Ed.2d at p. 350].) Accordingly these decisions do not stand for the proposition that the press and its representatives are immune from liability for crimes and torts committed in news gathering activities simply because the ultimate goal is to obtain publishable material. Rather, the Supreme Court has emphasized that "[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." (*Associated Press* v. *Labor Board* (1937) 301 U.S. 103, 132-133 [81 L.Ed. 953, 961, 57 S.Ct. 650]; see also *Branzburg* v. *Hayes* (1972) 408 U.S. 665, 683 [33 L.Ed.2d 626, 640, 92 S.Ct. 2646].)

This point was reiterated in *Dietemann* v. *Time, Inc.* (9th Cir. 1971) 449 F.2d 245. There employees of the defendant publisher gained entrance to the plaintiff's home by subterfuge. Once inside, by means of a hidden camera and electrical devices, they photographed him and recorded his conversations and ultimately published these things in a magazine. In the plaintiff's action for invasion of privacy, the Court of Appeals rejected the claim that the defendant's actions were privileged. The court proclaimed: "The First Amendment has never been construed to accord newsmen immunity from

torts or crimes committed during the course of news gathering. The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office. It does not become such a license simply because the person subjected to the intrusion is reasonably suspected of committing a crime." (449 F.2d at 249, fns. omitted.) Similarly, in *Galella* v. *Onassis* (2d Cir. 1973) 487 F.2d 986, a photographer was found guilty of tortious conduct through constant surveillance and his obtrusive and intruding presence. The photographer asserted that his conduct was privileged because he was gathering news. The Court of Appeals rejected the contention, saying: "There is no such scope to the First Amendment right. Crimes and torts committed in news gathering are not protected. [Citations.] There is no threat to a free press in requiring its agents to act within the law." (487 F.2d at pp. 995-996.)

While reporters are not privileged to commit crimes and independent torts in gathering the news, and the press has no special constitutional right of access to information, "news gathering is not without its First Amendment protections." (*Branzburg* v. *Hayes, supra,* 408 U.S. at p. 707 [33 L.Ed.2d at p. 655].) In fact, "without some protection for seeking out the news, freedom of the press could be eviscerated." (*Id.,* at p. 681 [33 L.Ed.2d at p. 639].) The First Amendment therefore bars interference with this traditional function of a free press in seeking out information by asking questions.[5] Thus it is that "a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources and that government cannot restrain the publication of news emanating from such sources." (*Pell* v. *Procunier* (1974) 417 U.S. 817, 834 [41 L.Ed.2d 495, 508, 94 S.Ct. 2800], citations omitted.) Consequently, the news gathering component of the freedom of the press—the right to seek out information—is privileged at least to the extent it involves "routine . . . reporting techniques." (See *Smith* v. *Daily Mail Publishing Co., supra,* 443 U.S. at p. 103 [61 L.Ed.2d at p. 405].) Such techniques, of course, include asking persons questions, including those with confidential or restricted information. While the government may desire to keep some proceedings confidential and may impose the duty upon participants to maintain confidentiality, it may not impose criminal or civil liability upon the press for obtaining and

[5]We are not here concerned with any claimed right of access by the press to confidential information. (See Helle, *The News-Gathering/Publication Dichotomy and Government Expression* (1982) Duke Law J. 1, 32-41.) Governmental restrictions upon the right of access pose substantially different questions from those raised by the application of traditional tort concepts to the ordinary news-gathering activities of reporters. It is the right to ask, not the right to receive, that is at stake here. "Of course, 'the Press is free to try to uncover, and if it succeeds it is free to publish' the information that the government attempts to conceal." (*Id.,* at p. 44, quoting from Henkin, *The Right to Know and the Duty to Withhold: The Case of the Pentagon Papers* (1971) 120 U. Pa. L. Rev. 271, 278.)

publishing newsworthy information through routine reporting techniques. (See *Landmark Communications, Inc.* v. *Virginia, supra,* 435 U.S. at pp. 837-838 [56 L.Ed.2d at p. 9].)

With these principles in mind we turn to a consideration of the allegations of plaintiff's complaint. Plaintiff first alleges that the defendants "caused there to be disclosed to unauthorized persons and for unauthorized purposes the fact that the Commission had evaluated Plaintiff as unqualified for appointment to judicial office." With regard to the media defendants this allegation simply states that the defendants published the information. This allegation is in all respects identical to the published disclosures in *Landmark Communications,* and we agree with the media defendants that no cause of action arises from this constitutionally protected activity.

The disclosure of the information forms the factual basis for all of plaintiff's causes of action against the media defendants except the fourth cause of action, which is asserted as a breach of the right of privacy by intrusion. In that cause of action plaintiff alleged that the defendants "pursued and conducted an unreasonably intrusive investigation into Plaintiff's confidential and private affairs by means of soliciting, inquiring, requesting and persuading agents, employees and members of the STATE BAR to engage in the unauthorized and unlawful disclosure of information [knowing such information to be confidential]." This allegation simply states that the media defendants sought out the newsworthy information which they subsequently published. This type of activity, at least, is within the news gathering activities which are protected by the First Amendment. (See *Branzburg* v. *Hayes, supra,* 408 U.S. at pp. 681, 707 [33 L.Ed.2d at pp. 639, 655].) **(4)** Since those activities are protected by the First Amendment, state law may not impinge upon them by characterizing the activities as tortious. Stated differently, the constitutional protection accorded normal news-gathering activities does not depend upon the characterization of the cause of action seeking to impose sanctions upon its exercise. As the Supreme Court explained in the *New York Times* case, "[i]n deciding the question now, we are compelled by neither precedent nor policy to give any more weight to the epithet 'libel' than we have to other 'mere labels' of state law. Like insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 269 [11 L.Ed.2d at p. 700].) Since the activities of the media defendants in this case fall within the protected ambit of the First Amendment, it does matter how plaintiff labels his several causes of action. For the same reason that "liability cannot be im-

posed on any theory for what has been determined to be a constitutionally protected publication" (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 265 [208 Cal.Rptr. 137, 690 P.2d 610]), it cannot be imposed for constitutionally protected news gathering. Thus we agree again with the media defendants that no cause of action has been stated here for the publication of news gathered in a constitutionally protected fashion.[6]

■ This brings us to plaintiff's final contention on appeal. As part of his general allegations plaintiff alleged that the defendants "conspired and agreed among themselves to disclose [the evaluation] to unauthorized persons and for unauthorized purposes." He further alleged that the defendants committed the acts of disclosure in furtherance of their conspiracy. Given the other alleged facts of this case, the conclusory allegation of a conspiracy cannot serve to transform privileged behavior of the media defendants into tortious misbehavior.

"The gist of an action charging civil conspiracy is not the conspiracy but the damages suffered." (*Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64 [35 Cal.Rptr. 652].) Conspiracy is not in itself a tort; it is simply a legal theory which will render all the participating members responsible for the wrong committed. (*Ibid.*) In order to state a cause of action based upon a conspiracy theory the plaintiff must allege the formation and operation of the conspiracy, the wrongful act or acts done pursuant to it, and the damage resulting from such acts. (*Ibid.*) In making such allegations bare legal conclusions, inferences, generalities, presumptions, and conclusions are insufficient. (*117 Sales Corp.* v. *Olsen* (1978) 80 Cal.App.3d 645, 650 [145 Cal.Rptr. 778].) This rule has particular applicability here where the alleged object of the conspiracy, the publication of newsworthy information, is a matter the media defendants were constitutionally privileged to do and the only acts the defendants are alleged to have done pursuant to the conspiracy were privileged. Under such circumstances plaintiff cannot be permitted to avoid the effect of the constitutional privilege by the mere artifice of alleging that defendants acted pursuant to a conspiracy. (See *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 390, fn. 7 [182 Cal.Rptr. 438]; *Brody* v. *Montalbano* (1978) 87 Cal.App.3d 725, 732, fn. 2 [151 Cal.Rptr. 206]; *Pettitt* v. *Levy* (1972) 28

[6]In ruling on the demurrer the trial court reasoned that all the causes of action were based upon publications which were privileged under the First Amendment. With respect to the fourth cause of action the court further held that the damages due to intrusion were caused by publication and since publication was privileged no cause of action could be stated. We disagree with this reasoning because it would impermissibly insulate members of the press who exceed the boundaries of ordinary reporting techniques and who obtain information in an otherwise criminal or tortious fashion. As we noted in the text, the *Landmark Communications* court specifically did not extend its holding to persons who obtain information by unlawful means and thereafter disclose it. (435 U.S. at p. 837 [56 L.Ed.2d at p. 9].)

Cal.App.3d 484, 491 [104 Cal.Rptr. 650]; *Thornton* v. *Rhoden* (1966) 245 Cal.App.2d 80, 93 [53 Cal.Rptr. 706]; *Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 764 [343 P.2d 118].) In essence, plaintiff alleged a mutual agreement between the members of the press and others to gather newsworthy information about a public figure in a constitutionally protected fashion and then to print it. That allegation simply cannot, consistent with the Freedom of the Press Clause of the First Amendment, give rise to a cause of action in tort.

For all these reasons we conclude that the trial court properly sustained the demurrers to plaintiff's complaint. Since no liability exists under any theory for the media defendants' constitutionally protected conduct, "there are no circumstances under which an amendment would serve any useful purpose." (*Routh* v. *Quinn* (1942) 20 Cal.2d 488, 493-494 [127 P.2d 1].) Consequently, the trial court also properly sustained the demurrer without leave to amend. (*Ibid.* See also 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 945, p. 379.)

The judgment is affirmed.

Regan, Acting P. J., and Carr, J., concurred.