780 So.2d 310 (2001)
SEMINOLE TRIBE OF FLORIDA, a federally recognized Indian tribe, Appellant,
v.
TIMES PUBLISHING COMPANY, INC., a corporation doing business as The St. Petersburg Times, Bradley Goldstein, individually, and Jeff Testerman, individually, Appellees.
No. 4D00-1717.
District Court of Appeal of Florida, Fourth District.
March 21, 2001.
*311 Donald A. Orlovsky of Kamen & Orlovsky, P.A., West Palm Beach, for appellant.
Alison M. Steele, and George K. Rahdert of Rahdert, Anderson, McGowan & Steele, P.A., St. Petersburg, for appellees.
GROSS, J.
The Seminole Tribe of Florida (Tribe) appeals an order dismissing its amended complaint against The St. Petersburg Times (Times) and two of its reporters, Bradley Goldstein and Jeff Testerman.
In reviewing an appeal from an order granting a motion to dismiss for failure to state a cause of action under Florida Rule of Civil Procedure 1.140(b)(6), this court must "treat the factual allegations of the amended complaint as true and consider them in the light most favorable to the appellant." Burtman v. Tech. *312 Chems. & Prods., Inc., 724 So.2d 672, 673 (Fla. 4th DCA 1999).
The pleading alleges that reporters Goldstein and Testerman solicited employees and agents of the Tribe to reveal confidential and proprietary documents and information. The amended complaint identifies two such solicitations.
First, on June 30, 1997, Goldstein wrote a letter on Times letterhead to the Tribal Chairman's assistant, Patricia Diamond. The letter requested that she supply Goldstein with certain documents. In pertinent part, the letter said:
Dear Pat:
I understand the position this letter puts you in, but I've only the interest of the tribe at heart. I'm aware that you may be in possession of certain documents that could help our pursuit of the truth: namely how rank and file tribal members are being hurt by irresponsible leadership.
You don't need to contact me by telephone. But if copies of those documents were to arrive in an envelope that has no return address on it, the truth will get out and there will be no trace....
* * *
Anonymity is crucial. Your name will never come up. Anonymous notes, written on a home typewriter would be best.
The truth is crucial. No one else is willing to ensure that tribal members get what is owed to them. The FBI isn't. No one but the press. I hope you look into your heart and do the right thing. Innocent people are being hurt. And if something isn't done, then the problem could swallow up everyone.
Later, Goldstein telephoned Diamond at her home and repeated his request for tribal documents.
The second letter referenced in the amended complaint was from Goldstein to Timothy Lozon, a former tribal dentist. The letter was on Times letterhead and signed by Goldstein. The letter also requested information:
Dear Mr. Lozon:
I am a reporter for the St. Petersburg Times. We've formulated a team which has been working on an indepth look at the Seminole Tribe for the past five months. It's been brought to my attention that you used to work as the dentist for the tribe. We've heard some stories about the [I]ndian health service, your replacement, and the administration of the IHS money on the reservation. Could you please call us.... If you wish to speak to us on a background basis or can point us in other directions, we would really appreciate your help. You can help us follow the trail of federal money and perhaps explain how someone can be paid to administer the IHS program and be executive director of the tribe at the same time.
The reporters also asked for information from the Tribe's accountant. The pleading does not allege that Diamond, Lozon, or the accountant actually revealed any information.
The amended complaint asserted that Goldstein and Testerman knowingly sought and received information characterized as "confidential," "proprietary," "secret," or "classified" from unnamed "employees" and "agents" of the Tribe. During an interview with James Billie, Chairman of the Tribal Council, the reporters confirmed what type of documents the Tribe considered to be confidential and revealed that they had obtained many such documents from Tribe employees and agents.
In December, 1997, the Times published a three day series of news stories about the Tribe. The news articles are attached as exhibits to the amended complaint. The subject matter of the stories is fairly summarized in appellees' answer brief as follows:

*313 In Seminole gambling, a few are big winners: The Tribe pioneered high stakes Indian gambling casinos. The four Tribe casinos in Florida expected revenues of $497 million in fiscal 1997. Casino revenue [generates] monthly cash payments to each Tribe member, has enabled the Tribe's Chairman to own a yacht, a jet, and oil wells, and has enriched the non-Indian casino management. Just 20 years ago[,] government aid was the Tribe's main source of revenue, and the government still gives the [T]ribe millions for housing and other programs despite the casino revenue.

The players who couldn't stop winning: A Tribe casino, under non-Indian management, produced several individual winners of hundreds of thousands of dollars each, but discrepancies appeared. The United States Inspector General has investigated evidence of possible mismanagement by non-Indian companies, including cash skimming and tampering with slot machine micro-chips.

Branching out with little success: Few of the Tribe's business ventures besides gambling casinos, including an aircraft manufacturer and farming, have been profitable. Chairman Billie says it has been "trial and error" in diversification efforts.

Despite gambling Tribe receives government aid: Despite the cash dividends to members, the 2500 member Tribe still gets millions in federal and state government aid for housing and Head Start. A HUD audit found "deficiencies" in the Tribe's administration of the housing subsidy program. A former Head Start worker for the Tribe says she was fired for refusing to sign a false grant application.

Regulators have ties to Seminoles: The National Indian Gaming Commission, created to regulate Indian gambling, tried to broker a deal between Florida and the Seminoles to legalize full-scale casinos in the state.

Loyalty pays off for Tampa partner: During a non-Indian management company's 15 year relationship with the Tribe, it got $26 million in one year to manage two casinos, surviving a U.S. Inspector General audit saying one of the casinos was susceptible to fraud because of the lack of checks and balances, and other tribes' dismissals of the company from their casinos. The Tribe has lost around $6 million so far on a cruise ship venture to be run by a sister company.

Banking on full scale casinos: The Tribe and its business partners intend to lobby candidates for public office in favor of Las Vegas style casinos opposed by Governor Chiles. The Tribe is engaged in a legal battle to keep the video slot machines the United States Attorney says are illegal. A lawsuit to force government approval of the machines failed in the Supreme Court.

Seminoles gain entry in Caribbean casino: The Tribe has been investing in a casino on the island of St. Maarten. The casino was denied a license to open an Internet site because the Netherlands worried that information about its management company would "hurt the good name" of that nation.

King Bull: A profile of the Tribe's elected leader, Chairman James Billie, from his childhood according to a previously published biography, to his election as Chairman and career as a singer-entertainer, describing him as a leader not without his critics among Tribe members.
The amended complaint did not specify the portions of the news stories disclosing the "confidential," "proprietary," "secret," or "classified" information. However, the pleading identified the information wrongfully solicited by the Times as: distribution of federal money by the Tribe; genealogical information on Tribe members; vendor lists, including sale terms for goods and services; information relating to potential business opportunities and ongoing *314 negotiations; financial condition and operating information concerning the Tribe's businesses; financial documentation and fiscal data relating to actual and proposed Tribe budgets; documentation relating to gaming interests; medical documents relating to Indian Health Services and individual Tribe members; and information regarding Tribe spiritual and ceremonial practices.
Paragraph 11 of the amended complaint sets forth how the Tribe was damaged as a result of the publication of the news stories based on confidential information. The confidential "documentation and information" lost its "value and confidential character once it cease[d] to be confidential"; an "atmosphere of distrust" was created between tribal members and the Tribe; "[d]isruptive and negative changes [occurred] in employment relationships" between the Tribe and "many of its employees"; there arose "an air of suspicion detrimental to employee morale which has also caused interdepartmental communications to be more cumbersome, time consuming and strained"; the Tribe incurred expenses to "strengthen tribal security," including an upgrade of its computer systems; the news stories gave information to the Tribe's business competitors as to how to best "compete with the Tribe and gain competitive advantages"; by characterizing the Tribe as being "`inept' in business," the news stories will "more likely than not have a material effect in interfering with the Tribe's ability to negotiate meaningful joint ventures, partnerships and business arrangements with third parties"; the publication of information "adversely affected the bargaining position" of the Tribe in matters of "ongoing negotiation," including the acquisition of land in Central Florida; appellees' acquisition of information "led to a denigration of the stature" of the Tribe "in the eyes of its tribal membership." Finally, the amended complaint generally alleged that the publication of the articles caused "[g]overnmental and business disruption and interference" and "[i]nterference with the relationship" between the Tribe and its "employees and agents."
After its statement of facts and damages, the amended complaint alleged five causes of action. Count I attempted to state a claim for tortious interference of the business relationship between the Tribe and its "past and present" employees. The count alleged that the reporters' solicitation and procurement of confidential information constituted an intentional and unjustified interference with the Tribe/employee relationship; employees and agents who provided the confidential information "breached and violated their relationship with the Tribe."
The cause of action pled in count II was against the Times for negligent supervision of its reporters. Count III attempted to state a claim under Chapter 772, Florida Statutes (2000), the Civil Remedies for Criminal Practices Act. Count IV sought an injunction to prevent further solicitation of Tribe employees. Count V sought to impose a constructive trust on those records already obtained.
On April 25, 2000, the trial court granted appellees' motion to dismiss the complaint for failure to state a cause of action and dismissed the case with prejudice.
We first address the Tribe's argument that "a motion to dismiss should not be granted if the complaint sets forth facts upon which relief can be granted upon any theory" (citing Orlovsky v. Solid Surf, Inc., 405 So.2d 1363, 1364 (Fla. 4th DCA 1981)) (emphasis added). A plaintiff drafting a complaint must "state a cause of action alleging legal liability." Wells v. Brown, 303 So.2d 395, 396 (Fla. 2d DCA 1974). The complaint "must allege a cause of action recognized under law against the defendants; otherwise it does not, in contemplation of the rule, `inform the defendant of the nature of the cause against him.'" Kislak v. Kreedian, 95 So.2d 510, 514 (Fla.1957). In reviewing a dismissal for failure to state a cause of action, the obligation of the appellate court is not to *315 evaluate the stated facts in light of causes of action that might have been pled, but to view the facts in relation to the causes of action set forth in the complaint.
The elements of tortious interference with a contract or business relationship are: (1) the existence of a business relationship between the plaintiff and a third person, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform; and (4) damage to the plaintiff resulting from the third person's failure to perform. E.g., Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 742 So.2d 381, 385 (Fla. 4th DCA 1999); RESTATEMENT (SECOND) OF TORTS § 766 (1979).
The primary issue we address in this case is whether the reporters' conduct was improper or unjustified within the confines of the tort of interference. As the Restatement explains, when evaluating the propriety of a defendant's conduct,
[t]he issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation.
RESTATEMENT (SECOND) OF TORTS § 767 cmt. b (1979).
Section 767 of the Restatement sets forth a non-exhaustive list of factors to be weighed against each other and balanced in arriving at a judgment concerning the propriety of a defendant's conduct:
In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.
RESTATEMENT (SECOND) OF TORTS § 767 (1979); see Smith v. Emery Air Freight Corp., 512 So.2d 229, 230 (Fla. 3d DCA 1987); McCurdy v. Collis, 508 So.2d 380, 383 n. 1 (Fla. 1st DCA 1987).
We focus first on the "nature" of the reporters' conduct. The reporters' actions were not designed to terminate the ongoing relationship between the Tribe and its employees and agents. Unlike a traditional model for interference, where an employee is induced to end his relationship with his employer, the claim here is only that the reporters solicited isolated acts of disloyalty which affected the "quality" of that relationship. In Florida cases concerned with tortious interference of an existing employment relationship, the plaintiff typically demonstrates that the relationship was terminated or blocked in order to state a claim. See Chipley v. Atkinson, 23 Fla. 206, 212, 1 So. 934, 938 (1887); Mulligan v. Wallace, 349 So.2d 745, 747 (Fla. 3d DCA 1977); Lingard v. Kiraly, 110 So.2d 715, 717 (Fla. 3d DCA 1959).
The reporters' conduct in this case is not the type of conduct at which the tort is usually directed. The reporters did not undertake to influence the Tribe's employees and agents not to "deal with" the tribe. Sandra S. Baron, Hilary Lane, & David A. Schulz, Tortious Interference: The Limits of Common Law Liability for Newsgathering, 4 WM. & MARY BILL RTS. J. 1027, 1043 *316 (1996). The reporters did not resort to methods tortious in themselves, such as defamation, bribery, "physical violence, fraudulent misrepresentation and threats" and intimidation. RESTATEMENT (SECOND) OF TORTS § 767 (1979),
The second Restatement factor in evaluating a defendant's conduct is the actor's motive. The amended complaint alleges a racist motive, that the articles were "designed to encourage widespread community feelings of anti-Indian hatred and discrimination directed at the SEMINOLE TRIBE and its leadership." "To a large extent, inquiry into `motives' blends into the inquiry into justification for, or `interests' served by, the interference in question." Baron, Lane, & Schulz, 4 WM. & MARY BILL RTS. J. at 1047. As the Restatement observes:
There is obviously a very intimate relation between the factors of motive and of the interests that the actor is trying to promote by his conduct. So close is the relationship that the two factors might well be merged into a single one. The basis for the separation in this Section is that the factor of motive is concerned with the issue of whether the actor desired to bring about the interference as the sole or a partial reason for his conduct, while the factor of the actor's interests is concerned with the individual and social value or significance of any interests that he is seeking to promote.
RESTATEMENT (SECOND) OF TORTS § 767 cmt. d (1979). Although the amended complaint alleges a racist motive, the content of the articles attached to the pleadings is obviously non-racist. The articles are a recitation of facts about newsworthy matters. The news stories do not invite the reader to conclude that certain negative behaviors or characteristics are "Indian." Given the publication and content of the articles, another "motive" of the reporters was to report information of public concern, apart from the ill-will or spite alleged in the amended complaint.
The third restatement factor listed in section 767 concerns the interests of the Tribe with which the reporters interfered. As the complaint alleges, the Seminole Tribe is a "federally recognized sovereign government." The Tribe receives federal money. As it would be with any state or federal government, how the Tribe treats its members, conducts its finances, operates its businesses, and compensates its leaders are matters of concern to the public and to Tribe members into which the reporters were entitled to delve.
In addition, it is important to this analysis that the Tribe's principal business is gambling. The existing casinos are the camel's nose of casino gambling in Florida's proverbial tent. The proper response of the state to the expansion of organized gambling has been the subject of debate for the past twenty-five years. Therefore, the manner in which the Tribe operates its existing casinos is a matter of public concern which is a proper subject for news stories.
Most important to the balancing process in this case is an evaluation of the interests the reporters sought to further by their conduct and the social value of protecting those interests. The conduct about which the Tribe complains is the reporters' news gathering, an activity of constitutional significance. As the Supreme Court has written, "without some protection for seeking out the news, freedom of the press could be eviscerated." Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).
The United States Supreme Court has articulated the "limited First Amendment principle" that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." The Florida Star v. B.J.F., 491 U.S. 524, 533, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (quoting Smith v. Daily Mail Publ'g *317 Co., 443 U.S. 97, 103, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979)).
In Smith, the Court was asked to review a state statute that required prior court approval before a juvenile offender's name could be published. 443 U.S. at 98, 99 S.Ct. 2667. The Court declined to decide the case on prior restraint grounds; it found that the statute did not comply with the constitutional standards set forth in Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978)the punitive action of the statute was not necessary to further the state interests asserted. Id. at 102, 99 S.Ct. 2667. Because the journalists in Smith had "relied upon routine newspaper reporting techniques," the state could not constitutionally punish the newspaper because the interest the state advanced protecting the identity of juvenileswas deemed to be less substantial than the newspaper's competing First Amendment rights. Smith, 443 U.S. at 103-04, 99 S.Ct. 2667.
Although a "routine" news gathering technique is poorly defined, certainly it includes the practice alleged in this case of asking potential witnesses for information. The "routine techniques" described in Smith involved asking witnesses to a crime, the police, and an assistant prosecutor for the juvenile offender's name. Id. at 99, 99 S.Ct. 2667.
The social interest in protecting routine news gathering techniques was further amplified in Nicholson v. McClatchy Newspapers, 177 Cal.App.3d 509, 223 Cal. Rptr. 58 (1986). In Nicholson, an unsuccessful candidate for Attorney General sued the state bar, two newspapers, and their reporters for damages arising from the publication of the confidential fact that the Commission on Judicial Nominees Evaluation had found him not qualified for judicial appointment. 223 Cal.Rptr. at 58-59. The causes of action asserted against the media defendants included one for breach of the common law right of privacy by intrusion. Id. at 59. The trial court found that the publication was constitutionally privileged and sustained the media defendants' demurrers without leave to amend. Id. The court of appeal affirmed. Id.
The plaintiff's argument in Nicholson was that the media defendants breached his privacy by resorting to news gathering activities similar to those at issue here "requesting and persuading" employees of the State Bar to engage in the "unauthorized and unlawful disclosure" of confidential information. Nicholson, 223 Cal.Rptr. at 64. The court characterized the allegation as stating that the media defendants sought out newsworthy information which they subsequently published in a newspaper. The court held that this type of activity was within the news gathering activities protected by the First Amendment. Id.
In reaching this conclusion the court relied upon Smith. Nicholson distinguished routine news gathering techniques from those employed in Dietemann v. Time, Inc. 449 F.2d 245 (9th Cir.1971), where newsmen gained entrance to the plaintiffs home by subterfuge, surreptitiously photographed him, and recorded his conversations with a hidden camera and electronic devices. Nicholson at 63. The court quoted the ninth circuit's conclusion that the "First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office." Id. (quoting 449 F.2d at 249).
Nicholson contrasted such unlawful conduct with routine news gathering techniques which include
asking persons questions, including those with confidential or restricted information. While the government may desire to keep some proceedings confidential and may impose the duty upon participants to maintain confidentiality, it may not impose criminal or civil liability upon the press for obtaining and publishing *318 newsworthy information through routine reporting techniques.
Nicholson, 223 Cal.Rptr. at 64 (citation omitted).
Considering the public interest in the free flow of information, the routine news gathering techniques used in this case, the subject matter of the information obtained as being of public concern, and the limited intrusion into the relationship between the Tribe and its employees and agents, we hold that the amended complaint fails to state a cause of action for tortious interference. Supporting the conclusion that there should be no liability under this tort action, these factors outweigh the allegation of the reporters' improper motive. See Baron, Lane, & Schulz, 4 WM & MARY BILL RTS J. at 1051-57; Dulgarian v. Stone, 420 Mass. 843, 652 N.E.2d 603, 608-09 (1995) (holding that there was no intentional interference with business relations by television station's investigative series where the interference was not "improper in motive or means").
We question whether this common law cause of action could ever be stretched to cover a case involving news gathering and publication. In many ways, this is a defamation case in the clothing of a different tort. The damages alleged are not quantifiable damages arising from the loss of benefits secured by an employment contract. The damages do not directly relate to any disruption of the employee/Tribe relationship with which the reporters interfered. Rather, the damages claimed are primarily soft ones, damages to reputation which affected the Tribe's relationship with its employees and with its potential business partners and competitors. The purported damages flowed from the publication of the news stories. As the seventh circuit has observed, permitting tortious interference in this context would allow an "end run" around the rules that apply to invasion of privacy,[1] and defamation involving media defendants:
Any libel of a corporation can be made to resemble in a general way this archetypal wrongful-interference case, for the libel will probably cause some of the corporation's customers to cease doing business with it; and whether this involves an actual breaking of contracts or merely a withdrawal of prospective business would make no difference under the modern law of wrongful interference. But this approach would make every case of defamation of a corporation actionable as wrongful interference, thereby enabling the plaintiff to avoid the specific limitations with which the law of defamationpresumably to some purposeis hedged about.
Brown & Williamson Tobacco Corp. v. Jacobson, 713 F.2d 262, 273-74 (7th Cir. 1983).
In light of our conclusion with respect to count I, we agree with the trial court that count II failed to state a cause of action. Because the Tribe did not fully brief and argue the dismissal of counts III V, these points are deemed to have been waived. See Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997). "Merely making reference to arguments below without further elucidation does not suffice to preserve issues" on appeal. Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990).
AFFIRMED.
DELL and STEVENSON, JJ., concur.
NOTES
[1] See Cason v. Baskin, 155 Fla. 198, 20 So.2d 243, 250 (1944) (holding that "there is a right of privacy, distinct in and of itself and not merely incidental to some other recognized right, and for breach of which an action for damages will lie"); Valentine v. C.B.S., Inc., 698 F.2d 430, 432 (11th Cir.1983) (stating that under Florida law "the publication of facts regarding matters of legitimate public or general interest will not support an invasion of privacy action").