Filed 9/30/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PAUL RAEF, | B259792 |
| Petitioner, | (Los Angeles County Super. Ct. No. 2VY03020) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, APPELLATE DIVISION, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Thomas Rubinson, Judge. Petition denied.

Horvitz & Levy, Barry R. Levy, Jeremy B. Rosen, and Mark A. Kressel; Eisner Gorin, Dmitry Gorin and Brad Kaiserman for Petitioner.

Scott & Cyan Banister First Amendment Clinic, UCLA School of Law, and Eugene Volokh, for Pennsylvania Center for the First Amendment and the Marion B. Brechner First Amendment Project as Amici Curiae on behalf of Petitioner.

Jassy Vick Carolan, Jean-Paul Jassy and Kevin L. Vick for Reporters Committee for Freedom of the Press, Associated Press Media Editors and Associated Press Photo Managers, Association of Alternative Newsmedia, California Broadcasters Association, California Newspaper Publishers Association, E.W. Scripps Company, and National Press Photographers Association as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Michael N. Feuer, City Attorney, Debbie Lew, Assistant City Attorney, Katharine H. Mackenzie, Deputy City Attorney, for Real Party in Interest.

_____

Paul Raef was charged with two violations of Vehicle Code, section 40008, subdivision (a),[1] which increases the punishment for reckless driving and other traffic offenses committed with the intent to capture an image, sound recording, or other physical impression of another person for a commercial purpose. The trial court sustained Raef's demurrer and dismissed the charges on the ground that the statute was unconstitutional. The Appellate Division of the Los Angeles County Superior Court reversed. Raef petitioned for a writ of mandate, and on direction by the California Supreme Court, we issued an order to show cause.

We conclude that section 40008 does not violate the First Amendment of the United States Constitution. It is a law of general application that does not target speech or single out the press for special treatment and is neither vague nor overbroad. The petition is denied.

---

[1] Unless otherwise indicated, statutory references are to the Vehicle Code, and references to section 40008 are to subdivision (a) of that section.

## PROCEDURAL SUMMARY

In 2012, Raef was charged with driving in willful and wanton disregard for the safety of others (count 1) and following another vehicle too closely (count 2), both with the intent to capture a visual image of another person for a commercial purpose. (§ 40008, subd. (a).) He also was charged with driving in willful and wanton disregard for the safety of others (§ 23103, subd. (a), count 3), and refusing to comply with a lawful order of a peace officer (§ 2800, count 4).[2] He demurred to counts 1 and 2 on the ground that section 40008 violates the First Amendment of the United States Constitution (hereafter, First Amendment) and article 1, section 2(a) of the California Constitution.[3] The trial court sustained the demurrer to counts 1 and 2, ruling that section 40008, although content-neutral, targeted First Amendment activity and failed intermediate scrutiny because it was overinclusive.

The People appealed to the superior court appellate division and filed a petition for writ of mandate and a stay. (Case Nos. BS140861 & BR 050611.)[4] The appellate division granted the People's petition and directed the trial court to reinstate counts 1 and 2. This court originally denied Raef's petition to transfer the case or, alternatively, for writ of mandate. Raef petitioned for review to the California Supreme Court. (Case No. S222744.) The Supreme Court granted the petition and directed this court to issue an order to show cause. We issued the order as directed. Trial court proceedings have been stayed.

---

[2] According to news reports included in the record, Raef was charged for his alleged high-speed pursuit of pop star Justin Bieber and failure to stop when police attempted to pull him over. (See e.g. Winton, *Court Urges Charges Be Reinstated for Paparazzo in Bieber Chase*, L.A. Times (Feb. 3, 2013) <articles.latimes.com /2013/feb/03/local/la-me-bieber-paparazzi-20130201> [as of Feb. 4, 2013].)

[3] Raef has not advanced a separate analysis under the state Constitution.

[4] The People represent the appeal in case No. BR050611 is moot and dismissal is pending.

## DISCUSSION

### I

Raef and amici contend the increased penalties in section 40008 are directed specifically at celebrity photographers or "paparazzi,"[5] and unduly infringe on the freedom of "newsgatherers" in general, in violation of the First Amendment.[6] In contrast, the People maintain that section 40008 is a neutral law of general application that regulates traffic conduct and implicates the First Amendment only incidentally, if at all.

It is important to recognize at the outset that this writ proceeding arises out of an order sustaining a demurrer. It is thus the facial validity of the statute, not its particular application, that is at issue. To succeed in a typical facial challenge, Raef must show that "'no set of circumstances exists under which [section 40008] would be valid' [citation], or that the statute lacks any 'plainly legitimate sweep' [citation]." (*United States v. Stevens* (2010) 559 U.S. 460, 472.) The interpretation and constitutionality of a statute present issues of law, which we review de novo. (*Finberg v. Manset* (2014) 223 Cal.App.4th 529, 532.)

To determine the Legislature's intent and the law's purpose, "'[w]e begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.]" (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) To be ambiguous, the statutory language must be "susceptible to more than one reasonable interpretation." (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.)

---

[5] A "paparazzo" is "a free-lance photographer who aggressively pursues celebrities for the purpose of taking candid photographs." (Webster's 10th Collegiate Dict. (1995) p. 840.)

[6] The First Amendment prohibits any law "abridging the freedom of speech, or of the press." It applies to the states through the due process clause of the Fourteenth Amendment. (*Grosjean v. American Press Co., Inc.* (1936) 297 U.S. 233, 244.)

4

*A. The Statutory Language*

Section 40008 provides in relevant part that "any person who violates Section 21701, 21703, or 23103, with the intent to capture any type of visual image, sound recording, or other physical impression of another person for a commercial purpose, is guilty of a misdemeanor and not an infraction and shall be punished by imprisonment in a county jail for not more than six months and by a fine of not more than two thousand five hundred dollars ($2,500)." (§ 40008, subd. (a).)[7]  Of the traffic violations referenced in the predicate statutes, interfering with the driver's control of a vehicle (§ 21701) and tailgating (§ 21703) are infractions, and reckless driving (§ 23103) is a misdemeanor.[8] (§ 40000.15.)  If any of the three statutes is violated with the requisite intent for a commercial purpose, section 40008 allows the violation to be charged as a misdemeanor and imposes increased penalties.

On its face, section 40008 is not limited to paparazzi chasing celebrities or reporters gathering news.  Instead, the statute targets "any person" who commits an

---

[7] Section 40008, subdivision (b) doubles the penalties if the traffic violations endanger children.

[8] The predicate statutes read as follows:  "No person shall wilfully interfere with the driver of a vehicle or with the mechanism thereof in such manner as to affect the driver's control of the vehicle."  (§ 21701 [allowing exceptions only for driving instruction and road test].)

Section 21703 provides:  "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon, and the condition of, the roadway."

Section 23103 provides:  "(a) A person who drives a vehicle upon a highway in willful or wanton disregard for the safety of persons or property is guilty of reckless driving. [¶] (b) A person who drives a vehicle in an offstreet parking facility, as defined in subdivision (c) of Section 12500, in willful or wanton disregard for the safety of persons or property is guilty of reckless driving.  [¶] (c) Except as otherwise provided in Section 40008, persons convicted of the offense of reckless driving shall be punished by imprisonment in a county jail for not less than five days nor more than 90 days or by a fine of not less than one hundred forty-five dollars ($145) nor more than one thousand dollars ($1,000), or by both that fine and imprisonment, except as provided in Section 23104 or 23105."

enumerated traffic offense with the intent to capture the image, sound, or physical impression of "another person" for a commercial purpose. As Professor Erwin Chemerinsky explained in relation to another statute (Civ. Code, § 1708.8, which, too, forms part of what is popularly known as "California's anti-paparazzi legislation"[9] and uses almost identical language), a law so broadly formulated "applies to anyone—press or curious on-looker or stalking fan—who obtains images in the proscribed manner with the hope of selling them." (Chemerinsky, *Balancing the Rights of Privacy and the Press: A Reply to Professor Smolla* (1999) 67 Geo. Wash. L.Rev. 1152, 1155.) The law's broad formulation also applies without limitation "whenever the acts are done with the hope of generating a profit, whether the money is gained by selling the photos to the press or to fan clubs or to an obsessed stalker." (*Id*. at p. 1158.)[10] It may reach even a private

___

[9] Civil Code section 1708.8 originally was enacted in 1998 to create liability for physical and constructive invasion of privacy when "[a] person" either trespasses "in order to capture any type of visual image, sound recording, or other physical impression of the plaintiff" under specified circumstances, or "attempts to capture . . . any type of visual image, sound recording, or other physical impression of the plaintiff" in specified circumstances and manner. (Civ. Code, § 1708.8, subds. (a) & (b).) Where "the invasion of privacy was committed for a commercial purpose," the defendant is "subject to disgorgement . . . of any proceeds or other consideration obtained as a result of the violation . . . ." (*Id*., § 1708.8, subd. (d).) "[F]or a commercial purpose" means "with the expectation of a sale, financial gain, or other consideration." (*Id*., § 1708.8, subd. (k).) A First Amendment challenge to Civil Code section 1708.8 was rejected in *Turnbull v. American Broadcasting Companies* ((C.D.Cal., Aug. 19, 2004, No. CV 03–3554 SJO) 2004 WL 2924590, at *21).

Assembly Bill No. 2479, which added section 40008 to the Vehicle Code in 2010, also amended Civil Code section 1708.8, subdivision (c) to add "false imprisonment committed with the intent to capture any type of visual image, sound recording, or other physical impression of the plaintiff" as yet another basis for civil liability. (Stats. 2010, ch. 685, § 1; see generally Locke & Murrhee, *Is Driving With The Intent To Gather News A Crime? The Chilling Effects Of California's Anti-Paparazzi Legislation* (2011) 31 Loy. L.A. Ent. L.Rev. 83, 87–90.)

[10] In 1997, Professor Chemerinsky advised a special Senate committee that "[n]o law directed just at paparazzi is likely to withstand constitutional scrutiny. There never can be a clear line distinguishing the aggressive investigative reporter from the paparazzi." He then became involved in refining the original bill that enacted Civil Code Section 1708.8. (Chemerinsky, *supra*, 67 Geo. Wash. L.Rev. at pp. 1153–1154.)

detective hired by a spouse to document suspected adulterous behavior.  (Smolla, *Privacy and the First Amendment Right to Gather News* (1999) 67 Geo. Wash. L.Rev. 1097, 1111.)

There is no reason to interpret section 40008 as having a narrower scope of application than Civil Code section 1708.8.  (Cf. *Walker v. Superior Court* (1988) 47 Cal.3d 112, 132 ["[i]dentical language appearing in separate provisions dealing with the same subject matter should be accorded the same interpretation"].)  A person may violate section 40008 where the prohibited conduct is done with the intent to photograph or record any other person for the purpose of selling or transferring the image or recording for some valuable consideration to an unspecified end user to put to unrestricted use.  Nothing in the statutory language suggests the Legislature intended to target the gathering of newsworthy material to be delivered to the general public via some medium of mass communication.  As written, section 40008 applies without limitation, whether the intended image or recording is of a celebrity or someone with no claim to fame, whether it qualifies as news or is a matter of purely private interest, and whether it will be sold to the mass media or put to purely private use.

   *1.  Special Treatment of the Press*

The First Amendment does not immunize the press from "the enforcement of civil or criminal statutes of general applicability."  (*Branzburg v. Hayes* (1972) 408 U.S. 665, 682; see also *Cohen v. Cowles Media Co.* (1991) 501 U.S. 663, 669 ["[G]enerally applicable laws do not offend the First Amendment simply because their enforcement . . . has incidental effects on [the] ability to gather and report the news"].)  Raef contends section 40008 is not a law of general applicability because, "as a practical matter," the higher penalty for traffic offenses committed while gathering images for a commercial purpose will fall "exclusively on persons engaged in newsgathering—whether in a professional or amateur capacity."  That, he contends, violates the principle that the press may not be singled out for special treatment.

Laws which single out the press, or certain members of it, for special treatment are subject to heightened scrutiny because they pose "a particular danger of abuse by the

7

State." (*Arkansas Writers' Project, Inc. v. Ragland* (1987) 481 U.S. 221, 228.) That principle derives from cases invalidating taxation laws which facially, or as structured, discriminated against the press, or certain members of the press. (See *id*. at pp. 229–230 [sales tax was imposed on limited number of publishers]; *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue* (1983) 460 U.S. 575, 577–578 [use tax imposed on "the cost of paper and ink products consumed in the production of a publication" fell upon small number of newspapers]; *Grosjean v. American Press Co., Inc.*, *supra*, 297 U.S. at p. 241 [license tax based on weekly circulation fell upon 13 of 133 newspapers].)[11]

Raef incorrectly reads *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, *supra*, 460 U.S. 575, as invalidating a generally applicable use tax law that "as a practical matter" burdened the press. As the court in that case explained, the Minnesota use tax on the cost of paper and ink products consumed in the production of publications was a "special tax," "without parallel" in the state's tax scheme. (*Id*. at p. 582.) The tax on its face applied only to publications, and evidence before the court showed that after the enactment of a $100,000 exemption, only the largest publications had to pay the tax. (*Id*. at pp. 591–592.) In contrast, section 40008 applies generally to persons committing traffic offenses with the intent to gather certain types of audio-visual material for personal gain, regardless of the ultimate use of the gathered material. It does not impose a direct penalty on the publication of material gathered in violation of traffic laws, nor is there evidence that its enforcement has imposed an actual burden on the media.

Raef asks us to assume that only journalists can commit the three enumerated traffic offenses with the requisite intent and purpose, or to consider anyone who falls within the purview of the statute to be a journalist. We decline to go that far. In the

---

[11] More recently, the principle has been restated as applying to laws that "discriminate among media, or among different speakers within a single medium." (*Turner Broadcasting System, Inc. v. F.C.C.* (1994) 512 U.S. 622, 659 [content-neutral requirement that cable operators carry local stations was subject to intermediate scrutiny].)

1970's, the United States Supreme Court declined to create a "newsman's privilege" to laws of general applicability for fear that it would run into a definitional problem since virtually any author could claim to be "contributing to the flow of information to the public." (*Branzburg v. Hayes*, *supra*, 408 U.S. at p. 705.) More recently, the First Circuit Court of Appeals observed that "changes in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw. The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper." (*Glik v. Cunniffe* (1st Cir. 2011) 655 F.3d 78, 84.) Such an expansive view of journalism may be necessary to protect the right to film public officials performing their duties in a public space, so as to preserve "the stock of public information." (*Id*. at p. 82.) But taking photographs and making recordings for personal gain are not always or necessarily journalistic activities. If they were, a private detective who takes a person's photograph to sell to a client, or a blackmailer who does so to extort money would have to be characterized as a journalist.

Amici Pennsylvania Center for the First Amendment and the Marion B. Brechner First Amendment Project argue, by way of analogy to *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board* (1991) 502 U.S. 105 (*Simon & Schuster*), that section 40008 singles out contributors to the press, and therefore the press itself. That case invalidated New York's "Son of Sam" law, which required a criminal, and anyone who contracted with the criminal, to deposit income "from works describing his crime" in an escrow account for the benefit of the criminal's victims and creditors. (*Id*. at p. 108.) Amici rely on the court's reasoning that "[a]ny 'entity' that enters into such a contract becomes by definition a medium of communication, if it was not one already." (*Id*. at p. 117.) Amici reason further that if one side of such a contract is a medium of communication, then the other side must be "a contributor to a medium of

9

communication," and therefore any law that singles out such a person "singles out media of communication."

Amici would like us to extend the court's reasoning not only beyond the facts of the "Son of Sam" case, but also beyond the court's actual conclusion. The "Son of Sam" law reached contracts for "the reenactment of such crime, by way of a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, live entertainment of any kind . . . from the expression of such accused or convicted person's thoughts, feelings, opinions or emotions regarding such crime"—in short, for "works describing [the] crime." (*Simon & Schuster*, *supra*, 502 U.S. at pp. 108,109.) It imposed a direct financial burden not only on the criminal who sold the crime story, but also on the publisher that bought it. (*Id*. at p. 109.) In contrast, section 40008 is not limited to cases where the intended image or recording is to be used in a work to be made available to the general public through a communication medium; nor does the statute impose a direct penalty on any media outlet that buys material gathered in violation of traffic laws.

Moreover, the characterization of the entity contracting with the criminal as a communication medium was ultimately found to be irrelevant because the "Son of Sam" law imposed "content-based financial disincentives on speech," regardless of the identity of the speaker. (*Simon & Schuster*, *supra*, 502 U.S. at p. 117.) In other words, the law violated the right to free speech, regardless of whether it also levied a special tax on the press.

We conclude that, on its face, section 40008 does not target or discriminate against the news media. We next consider whether its intent element burdens speech rights generally.

### 2. *Laws Burdening Speech Activity*

In *American Civil Liberties Union of Illinois v. Alvarez* (7th Cir. 2012) 679 F.3d 583 (*Alvarez*), cited by Raef, the court reasoned that "[a]udio and audiovisual recording are communication technologies, and as such, they enable speech." (*Id*. at p. 597.) Some commentators have proposed that the use of such technologies is an expressive activity because the final product is inherently expressive. (See Kreimer, *Pervasive Image*

10

*Capture and the First Amendment: Memory, Discourse, and the Right to Record* (2011) 159 U.Pa. L.Rev. 335, 372–373, 390–391 ["captured images" are protected speech because they are inherently expressive, and "image capture" is expressive activity].) Others have been reluctant to go that far, arguing instead for greater protection for information gathering. (See McDonald, *The First Amendment and the Free Flow of Information: Towards a Realistic Right to Gather Information in the Information Age* (2004) 65 Ohio St. L.J. 249, 270, 354 [recognizing that use of cameras, audio and video recorders, in itself, cannot be characterized as "expressive activity," but arguing for broader right to gather information under free press clause].)

The court in *Alvarez*, *supra*, 679 F.3d 583 drew on both these approaches to conclude that an eavesdropping statute criminalizing all non-consensual audio recording implicated the First Amendment because it "necessarily limits the information that might later be published or broadcast—whether to the general public or to a single family member or friend—and thus burdens First Amendment rights. If . . . the eavesdropping statute does not implicate the First Amendment . . . , the State could effectively control or suppress speech by the simple expedient of restricting an early step in the speech process rather than the end result." (*Id*. at p. 597.)

Under First Amendment jurisprudence, "'enforcement of a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment.' [Citations.] When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play. On the other hand, when 'speech' and 'nonspeech' elements are combined, and the 'nonspeech' element (e.g., prostitution) triggers the legal sanction, the incidental effect on speech rights will not normally raise First Amendment concerns. [Citation.]" (*Alvarez*, *supra*, 679 F.3d at p. 602; compare *Barnes v. Glen Theatre, Inc.* (1991) 501 U.S. 560, 569 [public-indecency statute was subject to intermediate scrutiny when applied to expressive conduct, such as nude dancing] with *Arcara v. Cloud Books, Inc.* (1986) 478 U.S. 697, 707 [public health regulation was not subject to First Amendment scrutiny when applied against bookstore where prostitution took place]). Based on these principles, the eavesdropping statute in

11

*Alvarez* was found to burden First Amendment rights directly, by "specifically target[ing] a communication technology [because] the use of an audio recorder—a medium of expression—triggers criminal liability. The law's legal sanction is directly leveled against the expressive element of an expressive activity." (*Alvarez*, at pp. 602–603.)

Raef agrees that sections 21701, 21703, and 23103 are general traffic laws directed at all persons who interfere with the operation of a vehicle, tailgate, or drive recklessly, but argues that section 40008 is not because its enhanced penalties apply only to drivers who commit those offenses with the intent to engage in newsgathering. He argues further that the statute is a content-based regulation of speech because it "discriminates on its face between commercial newsgathering and noncommercial newsgathering, and between commercial newsgathering and all other forms of expressive activity."

In essence, Raef argues that the enhanced penalties of section 40008 attach to and therefore directly burden the intent to engage in a First Amendment activity. Assuming that the intent to take a photograph or make a recording of another person generally is entitled to First Amendment protection as a speech-producing activity, we are not persuaded that section 40008 punishes that intent per se or that the commercial purpose requirement imposes a content-based restriction on speech.

## a. Enhanced Punishment for Purposeful Conduct

The People argue that section 40008 is a penalty enhancement statute that increases the punishment for the underlying offenses if they are committed with the specified intent, but the intent element does not raise First Amendment concerns because the enhanced penalties it triggers are nevertheless directed at the prohibited conduct, not at any First Amendment activity. They rely on the reasoning in *Wisconsin v. Mitchell* (1993) 508 U.S. 476 (*Mitchell*), where the United States Supreme Court rejected a First Amendment challenge to a penalty-enhancement statute aimed at bias-motivated crimes.

The defendant in *Mitchell* challenged a statute that increased the penalty for an aggravated battery of a victim intentionally selected based on a discriminatory motive; he claimed the increased penalty violated the First Amendment "by punishing offenders'

12

bigoted beliefs" or "discriminatory motive, or reason, for acting." (*Mitchell*, *supra*, 508 U.S. at pp. 485, 487.) The court recognized that although biased speech and beliefs may be socially unacceptable and morally reprehensible, they do receive First Amendment protection, and laws targeting them may violate the rule against content-based censorship of unpopular speech. (*Mitchell*, *supra*, 508 U.S. at pp. 486–487; see also *R.A.V. v. City of St. Paul, Minn.* (1992) 505 U.S. 377, 396 ["Let there be no mistake about our belief that burning a cross in someone's front yard is reprehensible. But St. Paul has sufficient means at its disposal to prevent such behavior without adding the First Amendment to the fire]"); *Dawson v. Delaware* (1992) 503 U.S. 159, 167 [abstract beliefs of member of white supremacist prison gang were entitled to protection under First Amendment].)

Nevertheless, the court reasoned that motive is a relevant sentencing factor and a legitimate reason to set higher penalties for bias-motivated crimes. (*Mitchell*, *supra*, 508 U.S. at p. 486.)[12] Bias-motivated discriminatory conduct already is prohibited under antidiscrimination laws, and bias-motivated crime "inflicts greater individual and societal harm," such as emotional distress to the victim, community unrest, and retaliatory crime. (*Id*. at pp. 487–488.) The court concluded that the penalty-enhancing statute was aimed at the defendant's conduct and not at any protected expression of his beliefs. (*Id*. at p. 487.) It distinguished *R.A.V. v. City of St. Paul, Minn.*, *supra*, 505 U.S. 377, where an ordinance prohibiting "'messages of "bias-motivated" hatred' . . . was explicitly directed at expression (i.e., 'speech' or 'messages') . . . ." (*Mitchell*, at p. 487, quoting *R.A.V. v. City of St. Paul, Minn.*, at p. 392; see also *In re M.S.* (1995) 10 Cal.4th 698, 725 [following *Mitchell* to uphold Pen. Code, § 422.7, which raises bias-motivated misdemeanor to felony; *People v. Linberg* (2008) 45 Cal.4th 1, 37 [upholding Pen. Code, § 190.2, which enhances penalty for bias-motivated murder].)

---

[12] Although the court analogized discriminatory bias to a sentencing factor (*Mitchell*, *supra*, 508 U.S. at p. 486), it later clarified that the biased purpose of a hate-crime enhancement statute is an essential element of the charged offense. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 495–496.)

13

Under *Mitchell*'s reasoning, the First Amendment is not implicated when a belief or expression, which may be protected in other circumstances, is closely related to and motivates illegal conduct that causes special individual and societal harm. (*Mitchell*, *supra*, 508 U.S. at p. 487.) As one commentator observed, "[t]he impact on speech is, by reasonable calculation, incidental since speech considerations can only come into play after an underlying crime has been committed. In such a situation, there is reduced danger of censorship or other manipulation of ideas because the object of official regulation is behavior, not speech." (Eberle, *Cross Burning, Hate Speech, and Free Speech in America* (2004) 36 Ariz. St. L.J. 953, 975.)

*Mitchell*, *supra*, 508 U.S. 476 is not entirely on point because section 40008 is not an antidiscrimination or hate crime statute. Nor is the intent to photograph or record a person in public considered reprehensible, so as to raise a facial concern about censorship of unpopular speech. Moreover, the commercial purpose requirement of section 40008 provides an independent basis for the increased penalties, separate from the intent to engage in a First Amendment activity. Nevertheless, like the court in *Mitchell*, we are persuaded that the enhanced penalties in section 40008 cannot reasonably be severed from the conduct to which they attach.

As section 40008, subdivision (c) makes clear, the statute punishes an "act or omission," not intent. Driving is not an expressive activity, and driving in violation of traffic laws is not an accepted news or information gathering technique entitled to any special protection. (Cf. *Nicholson v. McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 519–520 [government "may not impose criminal or civil liability upon the press for obtaining and publishing newsworthy information through routine reporting techniques," such as asking questions].) Raef proceeds on the incorrect assumption that, as written, section 40008 does not differentiate the traffic offenses subject to its increased penalties from those subject to the predicate statutes, and as a result imposes an additional penalty on the intent to engage in a protected activity. But it is well established that the more purposeful the criminal conduct, the more serious the offense and the more severe the punishment. (See *Mitchell*, *supra*, 508 U.S. at p. 485, quoting *Tison v. Arizona* (1987)

14

481 U.S. 137, 156.)  The increased penalties of section 40008 attach to purposeful traffic violations that target particular individuals for personal gain.

Assuming the intent to take a photograph or make a recording is an intent to engage in an expressive, or potentially expressive, activity, that intent is subject to section 40008 not because of the "communicative impact" of the intended activity, but because of the "special harms" produced by the conduct it motivates.  (*Roberts v. United States Jaycees* (1984) 468 U.S. 609, 628 ["potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection"].)  As the People point out, the conduct which section 40008 targets is not garden-variety tailgating, reckless driving, or interference with the driver's control of a vehicle.  It involves "relentless" pursuits of targeted individuals on public streets, as well as corralling and deliberately colliding with their vehicles.  Such goal-oriented conduct hounds the targeted individuals, causing them to react defensively and escalating the danger to the violators, the targeted individuals, and the public.  Because the predicate statutes do not require that the traffic offenses be committed with a specific intent and for a particular purpose, it cannot be said that the conduct they punish is indistinguishable from that subject to section 40008.

### b.  Commercial Purpose

Raef's argument that the commercial purpose requirement renders section 40008 a content-based regulation of speech also is flawed.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  (*Reed v. Town of Gilbert* (2015) 576 U.S. ___, 135 S.Ct. 2218, 2227 (*Reed*).)  Raef analogizes the commercial purpose of section 40008 to the distinction between commercial, noncommercial and labor activities in shopping mall cases.  In such cases, the mall rules define the type of allowed, prohibited, or restricted expressive activity by reference to its content, and the First Amendment is implicated when the rules discriminate among the activities they define.  (See *Best Friends Animal Society v. Macerich Westside Pavilion Property LLC* (2011) 193 Cal.App.4th 168, 172 [rules distinguished between noncommercial expressive activity "such as political and

religious speech, the request for signatures on petitions, the registration of voters and the dissemination of noncommercial leaflets or flyers," and qualified labor activity]; see also *Snatchko v. Westfield LLC* (2010) 187 Cal.App.4th 469, 474–475 [rules allowed strangers to talk about mall related matters but not to engage in noncommercial expressive activity, such as speaking about religion].)

There is no justification for equating "commercial purpose," as used in section 40008, to "commercial expressive activity," as defined in shopping mall rules. As defined in the related statute, Civil Code section 1708.8, subdivision (k), "commercial purpose" means "the expectation of a sale, financial gain, or other consideration." In the context of section 40008, the phrase adds personal, most probably pecuniary, gain as a motive to commit the traffic offense, without limiting the content of any intended final product. As we explained, purposeful conduct may be subject to increased punishment, and the desire to enrich oneself at all costs is a legitimate aggravating factor. (See *Mitchell*, *supra*, 508 U.S. at p. 485 [noting that in many states "commission of a murder, or other capital offense, for pecuniary gain is a separate aggravating circumstance"]; see also e.g. 8 U.S.C. § 1324(a)(1)(B)(i) [enhancing penalty for bringing in or harboring aliens "for private financial gain and commercial advantage"].)

*B. Legislative History*

Raef argues that the legislative history of section 40008 makes clear the statute was intended to target paparazzi gathering celebrity images while driving. He argues further that "[t]he Legislature's undisputed *purpose* was to discriminate against gathering celebrity images as compared to other presumably more legitimate news," making the statute constitutionally suspect.

Established rules of statutory construction dictate that "[a]lthough legislative history often can help interpret an ambiguous statute, it cannot change the plain meaning of clear language." (*In re Steele* (2004) 32 Cal.4th 682, 694.) In the First Amendment context, the United States Supreme Court has similarly held that an alleged illicit legislative motive may not vary clear statutory language so as to render a statute unconstitutional. (*United States v. O'Brien* (1968) 391 U.S. 367 (*O'Brien*).) In *O'Brien*,

16

the facial challenge to a federal statute prohibiting the knowing destruction or mutilation of Selective Service certificates, or draft cards, was based on Congress's alleged motive to suppress anti-war protest. (*Id*. at pp. 382–383.) The court explained that an otherwise constitutional statute cannot be invalidated based on an allegedly illicit legislative motive. (*Id*. at p. 383.) The question rather is whether "the inevitable effect of a statute on its face may render it unconstitutional." (*Id*. at p. 384.) The court concluded the statute had "no such inevitable unconstitutional effect, since the destruction of Selective Service certificates is in no respect inevitably or necessarily expressive." (*Ibid*.)

The court nevertheless reviewed the statute's legislative history. (*O'Brien*, *supra*, 391 U.S. at pp. 385–386.) It noted that while two legislative reports showed "a concern with the 'defiant' destruction of so-called 'draft cards' and with 'open' encouragement to others to destroy their cards, both reports also indicate[d] that this concern stemmed from an apprehension that unrestrained destruction of cards would disrupt the smooth functioning of the Selective Service System." (*Ibid.*) The legislative history thus confirmed that Congress's purpose was to protect its system for raising armies, not to suppress anti-war protest. (*Id*. at pp. 381, 386.)

Raef also relies on the principle, repeated most recently in *Reed*, *supra*, 135 S.Ct. 2218, that strict scrutiny applies not only to laws that are content based on their face, but also to laws "that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" (*Id*. at p. 2227, citing *Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 (*Ward*).) Because the sign ordinance at issue in *Reed* was content based on its face, the court had no reason to examine the government's justification for enacting it. (*Reed*, at p. 2227.) Nevertheless, in earlier cases, the court has made clear that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (*Ward*, at p. 791.) The court also has rejected the "the contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate . . . ." (*Hill v. Colorado* (2000)

17

530 U.S. 703, 724–725 [statute creating buffer zones outside clinics was content-neutral despite being enacted to end harassment by abortion opponents].)

Raef represents that the legislative history of section 40008 "expresses disdain for paparazzi's subject material and audience," citing to pages in the record containing letters by supporters of Assembly Bill No. 2479, which added section 40008, newspaper articles, and legislative analyses summarizing the views of the bill's author. As explained in *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, many items contained in a bill history file, such as media articles and the views of interested persons, are not cognizable evidence of the Legislature's intent. (*Id.* at p. 37–39.) In any event, Raef does not point to specific examples of the disapproval of paparazzi's subject matter allegedly contained in many of these materials.

Raef quotes a small portion of the summary of the bill author's statement included in an analysis prepared for the Assembly's concurrence in the Senate amendment that added what would eventually become section 40008. The full summary reads as follows: "According to the author, this bill is intended to curb the reckless and dangerous lengths that paparazzi will sometimes go [to] in order to capture the image of celebrities. Of particular concern is the practice of surrounding a celebrity or the celebrity's vehicle in a manner that does not permit an avenue of escape. In addition, paparazzi have allegedly engaged in dangerous and high-speed chases on the public highways in their effort to capture photographs. The author contends that this kind of behavior is especially a problem in Los Angeles, with its high concentration of stars and celebrities." (Conc. in Sen. Amendments, analysis of Assem. Bill No. 2479 (2009-2010 Reg. Sess.) as amended Aug. 20, 2010, p. 3.)

Raef also quotes an incomplete portion of a comment on the intent of the bill, which reads in full: "[T]his bill is primarily an effort to curb the often aggressive tactics used by paparazzi to capture images and recordings of celebrities and their families in order to satiate a public that clamors for the intimate details of the lives of Hollywood stars." (Conc. in Sen. Amendments, analysis of Assem. Bill No. 2479 (2009–2010 Reg. Sess.) as amended Aug. 20, 2010, p. 2.) Raef focuses on the latter portion of the

18

comment, which appears to be a restatement of the position of paparazzi defenders, who blamed the problem on the public interest in "the most mundane details of the celebrities' lives." (Senate Rules Committee, Office of Senate Floor Analyses, report on Assem. Bill No. 2479 (2009–2010 Reg. Sess.) as amended June 1, 2010, p. 4.) The first portion of the comment, however, makes clear that the bill's intent was to curb the paparazzi's "aggressive tactics."

We see no evidence that the Legislature's purpose in passing the Senate amendment of Assembly Bill No. 2479 was to censor the type of material paparazzi offer to the public; to the contrary, the legislative history confirms that the Legislature was primarily concerned with regulating the paparazzi's conduct. Furthermore, the fact that the immediate problem before the Legislature was the conduct of a particular group of "speakers" does not mean that section 40008, as written, may not be enforced against others who come within its scope. (Cf. *Hill v. Colorado*, *supra*, 530 U.S. at pp. 724–725 [by its terms, statute enacted to end harassment outside clinics by abortion opponents applies to "all demonstrators whether or not the demonstration concerns abortion, and whether they oppose or support the woman who has made an abortion decision"].)

In sum, we conclude that section 40008 does not target the intent to engage in a First Amendment activity or the communicative aspects of any such activity; it is aimed at the special problems caused by the aggressive, purposeful violation of traffic laws while targeting particular individuals for personal gain. Since the legal sanction is triggered by the noncommunicative aspects of the violator's conduct, any incidental effect on speech does not necessarily raise First Amendment concerns. (*Mitchell*, *supra*, 508 U.S. at p. 487; *Arcara v. Cloud Books, Inc.*, *supra*, 478 U.S. at p. 707; see generally *Alvarez*, *supra*, 679 F.3d at p. 602.)

### C. Incidental Effect on Speech

To the extent section 40008 incidentally affects speech by increasing the penalties for conduct motivated in part by the intent to engage in speech-producing activity, it is subject at most to an intermediate level of scrutiny. (*Turner Broadcasting System, Inc. v. F.C.C.*, *supra*, 512 U.S. at p. 662.) When "'speech' and 'non-speech' elements are

19

combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms." (*O'Brien*, *supra*, 391 U.S. at p. 376.) A content-neutral regulation that has an incidental effect on speech satisfies the First Amendment if it "furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (*Id.* at p. 377.)

"To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the [g]overnment's interests. 'Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."' [Citation.] Narrow tailoring in this context requires, in other words, that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.' [Citation.]" (*Turner Broadcasting System, Inc. v. F.C.C.*, *supra*, 512 U.S. at p. 662.) So long as the legislative decision is supported by substantial evidence, it is entitled to deference, "lest we infringe on traditional legislative authority to make predictive judgments . . . ." (*Turner Broadcasting System, Inc. v. F.C.C.* (1997) 520 U.S. 180, 196.)

## 1. *Evidence of Harm*

Raef does not dispute the importance of the government's interest in traffic safety, but he argues that the evidence before the Legislature regarding the scope and seriousness of the paparazzi problem was insufficient because it was based solely on anecdotes about specific instances of outrageous behavior. He reads *United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803 (*Playboy*) as requiring "empirical evidence" in all cases. In *Playboy*, a federal statute required cable operators to fully scramble or block sexually explicit channels, or to limit them to certain times. (*Id.* at p. 808.) The legislative record was "near barren," and at trial the government relied on anecdotal evidence of a handful of complaints about "signal bleed," through which the

20

content of a scrambled program with sexual content could be seen or heard by children. (*Id*. at pp. 820–822.)  The court rejected the government's estimate that children in millions of homes were potentially exposed to signal bleed because the estimate was without adequate empirical support.  (*Ibid.*)  It concluded that the government could not justify "a nationwide daytime speech ban" with a handful of anecdotes and "supposition." (*Id*. at pp. 822–823.)

The court in *Playboy*, *supra*, 529 U.S. 803, did not hold that every problem requires a field study, or that no problem may be supported anecdotally.  Rather, it concluded the obvious—that the Government's estimate of affected households was speculative because a problem affecting millions of households could not statistically be supported by just a few complaints.  (*Id*. at p. 822.)  Other cases suggest that surveys, anecdotes, history, and common sense may sufficiently support a legislative finding of harm, depending on the circumstances.  (See *Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 628 [state bar ban on direct-mail solicitation within 30 days after accidents was supported by survey results and anecdotal record, despite lack of background information about survey procedure]; *Edenfield v. Fane* (1993) 507 U.S. 761, 771 [record was insufficient because it included no study *or* anecdotal evidence of dangers of in-person solicitation by accountants]; *Burson v. Freeman* (1992) 504 U.S. 191, 211 [buffer zones around polling places were justified by history, consensus, and "simple common sense"]; *Ward*, *supra*, 491 U.S. at pp. 785–786 [city guidelines controlling sound at bandshell events were prompted by complaints about excessive noise and crowd dissatisfaction at concerts].)

Raef also relies on cases holding that the government cannot invent a problem based on no evidence at all or based on a faulty generalization.  (*McCullen v. Coakley* (2014) 573 U.S. ___, 134 S.Ct. 2518, 2539 (*McCullen*) [state law creating 35-foot buffer zones around all abortion clinics was not justified by congestion in front of one clinic on Saturday mornings]; *Edwards v. City of Coeur d'Alene* (9th Cir. 2001) 262 F.3d 856, 865 [ordinance banning sign handles was adopted after court ruling in favor of protestor and without any evidence they posed danger to public safety].)  The court in *Edwards v. City*

21

*of Coeur d'Alene* suggested that the lack of empirical evidence would be less problematic if the law's impact on speech were negligible. (*Id*. at p. 865.)

Raef does not dispute that the legislative record contains evidence, albeit anecdotal, supporting the Legislature's concern over a pattern of paparazzi committing traffic violations in pursuit of celebrities, including tailgating, speeding, running red lights, driving on the wrong side of a street, and crashing into vehicles. It cannot fairly be said that the Legislature invented a problem based on little or no evidence.

Raef claims, however, that the record fails to show traffic violations by paparazzi are more injurious than those by other drivers, or that "newsgatherers" in general drive more dangerously than other drivers. The record supports a reasonable inference that traffic violations committed by paparazzi, or anyone engaging in paparazzi-like pursuits of images of others for personal gain, pose greater danger and are more blameworthy than those committed by drivers not engaged in such pursuits.

For example, it is reasonable to conclude that, unlike garden-variety tailgating, which is an infraction requiring no particular mental state, tailgating for the purpose of photographing an individual is not committed through inadvertence or inattention, is unlikely to be momentary and corrected by the tailgater, and may not be avoided by moving out of the tailgater's way. Both anecdotal evidence and common sense support the conclusion that the purposeful pursuit of an individual on public roads by one or more drivers results in several drivers driving recklessly and increases exponentially the danger to everyone on the road. The fact that the violators in these examples are motivated by a desire for personal enrichment makes such conduct more calculated and unseemly, and less random than simple inattention, or the sudden onset of road rage.

## 2. *Narrow Tailoring*

Raef incorrectly argues that section 40008 is underinclusive because it does not enhance the penalties for "a crazed fan who crashed into a celebrity's car in order to create an encounter, or a roadway bully or enraged lover who intentionally crashed into a victim's car to prevent escape." A law is underinclusive under the First Amendment if it abridges "*too little* speech." (*Williams-Yulee v. Florida Bar* (2015) 575 U.S. ___, 135

22

S.Ct. 1656, 1668.) Raef's examples do not involve speech, nor do they involve the same confluence of conduct, intent, and commercial purpose that section 40008 identifies as particularly dangerous or culpable. Moreover, "the First Amendment imposes no freestanding 'underinclusiveness limitation.' [Citation.] . . . A [s]tate need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." (*Ibid.*)

Raef also argues that section 40008 is not narrowly tailored because the government's interest in traffic safety could be achieved as effectively by increasing the penalties for all traffic offenders, creating recidivist statutes, enhancing the penalties for specific reckless driving acts, and charging offenders under existing criminal laws. (See e.g. Pen. Code, § 245, subd. (a)(1) [assault with a deadly weapon].) Because the record before us does not show that section 40008 imposes a serious burden on speech activity, we agree with the People that our consideration of such alternatives would constitute impermissible second-guessing of the Legislature.

As the court explained in *Ward*, *supra*, 491 U.S. 781, "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. [Citation.] So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. 'The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted. [Citations.]" (*Id.* at pp. 799–800.)

Raef does not believe any deference is in order, based on *McCullen*, *supra*, 134 S.Ct. 2518. But the record in that case showed that the fixed 35-foot buffer zone around abortion clinics imposed "serious burdens on . . . speech" by "closing a substantial portion of a traditional public forum [streets and sidewalks] to all speakers." (*Id.* at pp. 2535, 2541.) Because of that, the court considered less restrictive alternatives

23

adopted by other states and the federal government in the abortion context, as well as other existing laws. (*Id.* at pp. 2537–2539.) Unlike the law in *McCullen*, section 40008 does not close off a public forum because it does not generally prohibit taking photographs of others on public roads. Nor is there any evidence in the record that enforcement of section 40008 actually imposes any serious burden on speech or press rights.

The effectiveness and viability of the alternatives Raef proposes are not a foregone conclusion. Because the increased penalties in section 40008 are directed at the traffic violators' profit motive, which is not present in traffic violations subject to the predicate statutes, increasing the penalties for all traffic violations can hardly be justified. Raef has not identified existing laws that would as effectively regulate the variety of traffic violations, short of actual crashes, that can be committed in paparazzi-like pursuits. The legislature need not predict all the ways in which the statute may be violated, nor can all possible violations be subsumed in the category of reckless driving.

We conclude that section 40008 is sufficiently narrowly tailored to address the particular problem the Legislature sought to alleviate without unnecessarily or seriously burdening speech or press rights. To the extent that it elevates some traffic offenses from infractions to misdemeanors, it entitles the violator to significant procedural protections, such as the right to a jury trial. (Cal. Const., art. I, § 16; see *Turner v. Louisana* (1965) 379 U.S. 466, 472–473 ["In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel"].)

## II

Raef also argues that section 40008 is constitutionally void for vagueness and overbreadth.

Under the First Amendment, a statute is unconstitutionally overbroad if it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the

[statute's] plainly legitimate sweep[.]'" (*Virginia v. Hicks* (2003) 539 U.S. 113, 118–119.)  Overruling a statute based on overbreadth is a drastic measure, only necessary where "the threat of enforcement of an overbroad [statute] may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." (*Id.* at p. 119)  The overbreadth doctrine may not be used to block application of a statute "to constitutionally unprotected speech, or especially to constitutionally unprotected conduct." (*Ibid.*)

Raef compares section 40008 to the ordinance in *People v. Glaze* (1980) 27 Cal.3d 841, where all picture arcades were ordered closed during certain early morning hours because masturbation had taken place at some of them.  (*Id.* at p. 849.)  He argues that like the ordinance in *People v. Glaze*, section 40008 is based on the faulty assumption that just because some paparazzi have surrounded or crashed into celebrities' cars, or have engaged in high-speed chases with celebrities on the wrong side of the road, it is necessary to impose enhanced penalties on the "journalist, photographer, videographer or sound engineer" who drives recklessly, "whether intentionally crashing into a celebrity or merely tailgating"; he also suggests that the statute "sweeps in basic reckless driving that previously merited only a minor infraction."

*People v. Glaze*, *supra*, 27 Cal.3d 841 is distinguishable.  In that case, there was no reason to limit the hours of arcades where no masturbation had occurred.  (*Id.* at p. 849.)  In contrast, here, Raef appears to suggest that the traffic offenses enumerated in section 40008 change in kind when committed by someone other than a paparazzo, even if they are committed with the requisite intent and purpose.  But there is no reason why section 40008 should not apply to any driver who follows too closely, swarms in, or drives recklessly with the requisite intent and purpose, whether or not the driver is a celebrity photographer.

As we have explained, under the predicate statutes, tailgating is an infraction that does not require proof of a mental state, whereas reckless driving already is a misdemeanor.  (See §§ 21703, 23103, 40000.15.)  Therefore, it is inaccurate to characterize reckless driving as an infraction under the predicate statutes or to equate

tailgating with reckless driving under section 40008. The increased penalties for tailgating in section 40008 are justified not because tailgating is a type of reckless driving, but because the tailgating that falls within the purview of section 40008 is committed intentionally for a commercial purpose.

Raef also argues that section 40008 is void for vagueness because it does not describe the prohibited conduct or specify the temporal scope of the required intent. Ordinarily, a person who engages in conduct "'that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,'" but that requirement has been relaxed in the First Amendment context, allowing the person to argue "that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech. [Citations.]" (*United States v. Williams* (2008) 553 U.S. 285, 304.) Yet "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.' [Citation.]" (*Ibid*.) A statute is vague not because "it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved," but because of "the indeterminacy of precisely what that fact is." (*Id*. at p. 306.) Statutes that have been struck down as void for vagueness "tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." (*Ibid*.) But whether someone had the required intent "is a true-or-false determination, not a subjective judgment. . . ." (*Ibid*.)

The conduct subject to section 40008 is described with reference to the predicate statutes and the intent element. The hypothetical scenarios Raef proposes strain the statutory language because they read into section 40008 intent different from the one actually included in the statute. The intent to make it on time to the airport, a press conference, or the scene of a disaster cannot reasonably be substituted for the intent to capture an image, sound recording, or physical impression of another person. The hypotheticals proposed by amici Pennsylvania Center for the First Amendment and the Marion B. Brechner First Amendment Project are flawed for the same reason. They suggest that section 40008 may apply even in situations of inadvertent tailgating or

26

rushing to report on a forest fire. Section 40008, by its terms, applies to traffic violations committed with the intent to photograph another person, not to those committed inadvertently or with the intent to photograph a burning forest.

To the extent that Raef and amici are concerned about "the possibility of overzealousness on the part of the arresting officer and not vagueness in the criminal statute," their concerns "can be adequately dealt with in the course of prosecution of individual cases on their individual facts." (*People v. Superior Court* (*Caswell*) (1988) 46 Cal.3d 381, 397, 398.) Raef and amici do not dispute that a person who tailgates, drives recklessly, or interferes with the operation of a vehicle will be stopped for a traffic violation, not for engaging in a speech activity. As we have discussed, if the traffic violation is charged as a misdemeanor under section 40008, the driver will have a right to a jury trial. (Cal. Const., art. I, § 16.) Any uncertainty about the driver's intent will be "addressed . . . by the requirement of proof beyond a reasonable doubt." (*United States v. Williams*, *supra*, 553 U.S. at p. 306.) Hypothetical concerns over potential misuse of the statute to unfairly target the press do not justify invalidating it on its face.

Section 40008 is neither vague nor overbroad and does not violate the First Amendment.

**DISPOSITION**

The petition is denied.

CERTIFIED FOR PUBLICATION

EPSTEIN, P. J.

We concur:

WILLHITE, J.                          COLLINS, J.

27